**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 12-cv-00650-CMA-MJW

GENOS "D.J." WILLIAMS,

      Plaintiffs,

v.

THE NATIONAL FOOTBALL LEAGUE,

      Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

      This matter is before the Court on Defendant's Motion for Summary Judgment

(Doc. # 49) and Plaintiff's Motion for Preliminary Injunction (Doc. # 36).  Genos "D.J."

Williams ("Plaintiff") seeks to vacate a labor arbitration award issued by the National

Football League ("Defendant") on February 6, 2012, pursuant to the Labor Management

Relations Act ("LMRA"), 29 U.S.C. § 185, and the Federal Arbitration Act ("FAA"),

9 U.S.C. §§ 1-16.  (Doc. # 12 at 1-2.)  Jurisdiction is proper under 28 U.S.C. § 1331.

## I. BACKGROUND

**A.    FACTUAL BACKGROUND[1]**

      On August 9, 2011, Plaintiff, a player for the Denver Broncos Football Club

("Broncos"), provided a urine specimen pursuant to the National Football League Policy

---

[1]  Despite the long factual narratives set forth by the parties, the Court accepts the arbitrator's findings of fact as true because "an arbitrator must find facts and a court may not reject those findings," absent circumstances not present here.  *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 38 (1987).

on Anabolic Steroids and Related Substances ("Policy") and the Substances of Abuse Program ("SAP").  (Doc. # 41-11 at 2.)  The Policy was collectively bargained for by the National Football League Management Council on behalf of all National Football League Clubs, and the National Football League Players' Association ("NFLPA") on behalf of all National Football League Players.  (Doc. # 44, ¶ 1).  On November 11, 2011, Plaintiff was notified, by letter, that he was being suspended six games for attempting to manipulate a specimen or test in violation of the Policy.  (Doc. # 41-11 at 2.)  The specimen did not contain endogenous steroids, and therefore "was not physiologically-produced human urine."  (*Id.*)  Subsequently, Plaintiff filed an appeal to overturn his suspension.  (*Id.*)  Specifically, Plaintiff contended the chain of custody demonstrated for his urine was incomplete, and the specimen was not collected and handled by the collector in accordance with protocol.  (*Id.* at 3-4.)  Moreover, he asserted that these failures undermined and compromised the integrity of the testing process and that the suspension should be dismissed.  (*Id.*)  Plaintiff's appeal was heard by Harold Henderson ("Mr. Henderson"), Senior Advisor to the Commissioner of the National Football League, on November 30, 2011.  (Doc. # 44, ¶ 1.)

The Policy required Mr. Henderson to "render a written decision with respect to disciplinary action within five (5) calendar days."  (Doc. # 49, ¶ 13.)  On December 16, 2011, Jeffrey Pash, Defendant's General Counsel and Executive Vice President, asked Mr. Henderson to delay rendering his decision regarding Plaintiff's award.  (Doc. # 49 at 23-24.)  On January 16, 2012, Plaintiff moved to dismiss the case against him because Mr. Henderson had not yet issued a decision.  (*Id.,* ¶ 24.)  On January 19,

2012, Mr. Henderson denied Plaintiff's request to dismiss the case.  (*Id., ¶* 25.)  In doing

so, Mr. Henderson informed Plaintiff that Mr. Pash had "asked [him] to delay a decision

on this matter to afford an opportunity for the parties to the governing collective

bargaining agreement, [Defendant] and the NFLPA, to explore an agreed resolution of

this dispute" and that the delay was "consistent with past practice." (*Id.*)  On February

6, 2012, Mr. Henderson issued his decision denying Plaintiff's appeal and upholding the

six-game suspension.  (*Id., ¶* 27.)

     Upon appeal of a positive test, the Policy sets forth the burdens of proof for each

party.  (Doc. # 41-11 at 4.)  It provides:

> The [Defendant] shall have the initial burden to establish a prima facie
> violation of the Policy, and the specimen collectors, independent
> administrator, consulting toxicologists and testing laboratories will be
> presumed to have collected and analyzed the player's specimen in
> accordance with the Policy.  The player may, however, rebut that
> presumption by establishing that a departure from the Policy's stated
> protocols occurred during the processing of his specimen.  In such case,
> the [Defendant] shall have the burden of establishing that the departure
> did not materially affect the validity of the positive test or other violations.

(*Id.*)  Additionally, the Policy sets forth collection procedures.  (*Id.* at 4-5.)  Specimens

are shipped in collection bottles with tamper-resistant seals, and the player is given the

opportunity to witness the procedure.  (*Id.* at 4.)  Also, each player is provided with an

Athlete Custody & Control Form ("Form") that identifies the player, provides information

about the specimen collected, and is signed by the player after the sample is collected.

(*Id.*)

     Defendant established a prima facie violation of the Policy by Plaintiff.  (*Id.* at 2.)

The burden then shifted to Plaintiff to establish a departure from the Policy.  (*Id.* at 3-4.)

Plaintiff did so, pointing to a gap in the chain of custody from 12:18 p.m. until 3:08 p.m. on August 11, 2011.  (*Id.*)  Additionally, Plaintiff argued that the specimen had not been sealed in his presence and that his signature had been forged on the Form.  (*Id.*)

However, Defendant established that the departure from its protocols did not materially affect the validity of the test.  (*Id.* at 7-9.)  First, Defendant contended that subsequent incidents demonstrated Plaintiff's "common scheme or plan" to manipulate tests.  (*Id.* at 3.)  Specifically, Defendant asserted that a urine specimen submitted on September 7, 2011, was not of human origin, and that on November 16, 2011, during the course of a specimen collection, Plaintiff dropped an unidentified bottle or vial on the floor as he was filling the collection bottle.  (*Id.* at 7.)  Second, Defendant argued that any errors in the collection paperwork were either explainable or insignificant and did not materially affect the validity of the test.  (*Id.* at 3.)  Third, Defendant provided 15 copies of the Form from prior tests bearing Plaintiff's signature, attempting to prove that he did in fact sign it on the date in question.  (*Id.* at 5.)  Fourth, Defendant suggested that Plaintiff had a motive for manipulating the tests as a violation of the Policy would result in discipline.  (*Id.* at 3.)  Finally, Defendant contended that the specimen collector, on the date in question, had no motive or reason to manipulate the specimen even assuming that he did not follow protocol.  (*Id.* at 6.)

Mr. Henderson concluded that the failure to follow collection protocols was "troubling" and suggested "that [Defendant] and NFLPA take steps to address what appears to be, at least in some places, an environment of haste, rushing, confusion and short cuts around the collection process."  (*Id.* at 9.)  However, he noted that the "Policy

would be eviscerated if every clerical mistake excused discipline . . . ."  (*Id.* at 7.)
Further, he determined that the deviations from established protocol in this case did not
materially affect the validity of the test and denied Plaintiff's appeal.  (*Id.*)  Specifically,
he concluded that: (1) there was no break in the chain of custody which materially
affected the validity of the laboratory test; (2) the Form was most likely signed by
Plaintiff; (3) there was no evidence that the specimen collector deliberately substituted
a substance for the player's collected specimen without the player's knowledge, nor
of any plausible motive for him to do so; and (4) the November 16, 2011 attempted
manipulation, as well as the two collected specimens that were determined not to be
human urine, painted a "compelling picture of deceit and evasion."  (*Id.* at 8-9.)

## B.    PROCEDURAL HISTORY

On March 12, 2012, Plaintiff filed a "Petition to Vacate Arbitration Award" under
the FAA in the District Court, City and County of Denver.  (Doc. # 3.)  Defendant
removed the action to this Court.  (Doc. # 1.)  On March 21, 2012, Plaintiff filed an
"Amended Petition to Vacate Arbitration Award," adding claims under the LMRA.  (Doc.
# 12.)  On the same day, Plaintiff filed a "Motion for Preliminary Injunction."  (Doc. # 36.)
Defendant responded to Plaintiff's "Amended Petition to Vacate," and on April 17, 2012,
Defendant filed a "Response to Plaintiff's Motion for Preliminary Injunction" (Doc. # 50)

and a "Motion for Summary Judgment" (Doc. # 49).  Both the "Motion for Summary

Judgment" and the "Motion for Preliminary Injunction" are ripe.[2]  The Court will address

the former first, as granting it would moot the latter.

## II.  STANDARD OF REVIEW[3]

Judicial review of an arbitration award "is among the narrowest known to the

law." *San Juan Coal Co. v. Intern. Union of Operating Engineers, Local 953*, 672 F.3d

1198, 1201 (10th Cir. 2012) (quoting *Champion Boxed Beef Co. v. Local No. 7 United

Food & Commercial Workers Int'l Union,* 24 F.3d 86, 87 (10th Cir. 1994)).  This is so

because the parties have bargained to settle their disputes through arbitration.  Thus,

a district court is not to consider whether an arbitrator was "correct or incorrect but only

to determine whether [the] decision draws its essence from the agreement."  *Pub. Serv.

Co. of Colo. v. Int'l Bhd. of Elec. Workers, Local Union No. III,* 902 F.2d 19, 20 (10th Cir.

1990); *see also Brown v. Coleman Co., Inc.*, 220 F.3d 1180, 1182 (10th Cir. 2000)

("By agreeing to arbitrate, a party trades the procedures and opportunity for review of

the courtroom for the simplicity, informality, and expedition of arbitration.") (quoting

*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31 (1991)).  Consequently, an

---

[2]  Plaintiff filed a timely Reply to Defendant's Response for Preliminary Injunction on May 3,
2012 (Doc. # 57), and a timely Response to Defendant's Motion for Summary Judgment on
May 8, 2012 (Doc. # 61).  Defendant filed a timely Reply to Plaintiff's Response for Summary
Judgment on May 22, 2012 (Doc. # 66).

[3]  The standard of review for a Motion for Summary Judgment requires the court to enter
judgment for the movant if there is "no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court has already noted
that it accepts as true the factual findings of the arbitrator.  Therefore, the Court will treat the
Motion for Summary Judgment as a Petition to Enforce the Arbitration Award, using the
standard applicable to such a petition.  Doing so makes sense here, because the relief
Defendant seeks is, in fact, the enforcement of the award.

arbitrator's factual findings and interpretation of the contract are beyond review "as long as [they] [do] not ignore the plain language of the collective bargaining agreement." *San Juan Coal Co.,* 672 F.3d at 1201. An award should be enforced if an arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority." *Id.* (quoting *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509 (2001) (*per curiam*)). On the other hand, an arbitration award may be vacated if the arbitrator "strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Id.* (quotation marks and citation omitted).

### III. <u>ANALYSIS</u>

Plaintiff argues that the award should be vacated because Mr. Henderson exceeded his power, engaged in misconduct, manifestly disregarded the law, and was not impartial. (Doc. # 49 at 3-5.) Additionally, Plaintiff maintains that the award should be vacated because it violates public policy. (*Id.* at 5.)

Pursuant to the FAA and LMRA, a district court is permitted to vacate an arbitration award if it finds that: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption by the arbitrator; (3) the arbitrator was guilty of misconduct in refusing to postpone a hearing, in refusing to hear evidence, or in misbehaving in some other way; or (4) the arbitrator exceeded his powers or imperfectly executed them. 9 U.S.C. § 10(a)(1)-(4); *see, e.g.*, *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001); *Int'l Bhd. of Elec. Workers, Local Union 1823 v. WGN of Colo., Inc.*, 615 F. Supp. 64, 66 (D. Colo. 1985) (stating that

"[t]he real test, however, under either the LMRA [or] the Federal Arbitration Act . . . is whether the arbitrator has exceeded the powers delegated to him by the parties"). Additionally, an award may be vacated for a "handful of judicially created reasons," including "violations of public policy, manifest disregard of the law, and denial of a fundamentally fair hearing." *Sheldon*, 269 F.3d at 1206.

The Court will discuss each of Plaintiff's allegations, in turn, below. Ultimately, however, the Court finds that Mr. Henderson's decision "draws its essence from the collective bargaining agreement" and, therefore, enforcement of the award as a matter of law is appropriate.

## A.    MR. HENDERSON DID NOT EXCEED HIS POWER

In determining if an arbitrator exceeded his power, the Court cannot substitute its judgment for that of the arbitrator. Rather, the Court must determine whether the arbitrator "had the power[,] based on the parties' submissions or the arbitration agreement, to reach a certain issue." *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003) (quoting *Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 220 (2d Cir. 2002)*).

Plaintiff asserts that Mr. Henderson exceeded his power by failing to follow the burden of proof set forth in the Policy, which required Defendant to establish that the violations of the procedures did not materially affect the validity of the test results. (*Id.* at 14.)   More specifically, Plaintiff argues that Mr. Henderson inappropriately placed the burden on him to prove that someone else had a motive to manipulate his urine samples.  (*Id.*)  However, "[a]n arbitrator's decision allocating the burden of proof among

the parties or in fixing the legal framework for evaluation of a grievance ordinarily cannot be reviewed in federal court."  *Sullivan, Long & Hagerty, Inc. v. Local 559 Laborers' Int'l Union,* 980 F.2d 1424, 1429 (11th Cir. 1993); *see also Furr's Supermarkets, Inc. v. United Food & Commercial Workers Union, Local 1564, Nos. 97-2002, 97-2020*, 1997 WL 699063, at *6 (10th Cir. Nov. 10, 1997) (table decision) ("in policing arbitration for compliance with . . . legal principle[s], . . . the courts would clearly be engaged in improper 'merits' review of arbitrators' decisions").  Moreover, Mr. Henderson did not ignore the plain language of the Policy in applying the burden of proof.  He concluded that Defendant's evidence, of Plaintiff having failed two drug tests and of having attempted to manipulate a third, was sufficient to establish that, notwithstanding the flaws in the chain of custody, the validity of the test results was not materially affected. (Doc. # 41-11 at 8-9.)  Further, Plaintiff's argument that Mr. Henderson inappropriately placed the burden on him to prove a motive for someone else to manipulate his urine sample is not supported by the findings in Mr. Henderson's report.  Mr. Henderson simply intimated that, in light of all the evidence against Plaintiff, a motive for someone else to have manipulated the test would have helped to prove its invalidity.  *Id.*

The Court is, likewise, not persuaded by Plaintiff's second claim that Mr. Henderson exceeded his power by failing to issue a decision within five days. (*See* Doc. # 61 at 21.)  An arbitrator does not exceed his power when he issues a late decision because "any limitation upon the time in which an arbitrator can render his [decision is] a directory limitation, not a mandatory one, and . . . it should always be within a court's discretion to uphold a late [decision] if no objection to the delay has

been made prior to the rendition of the [decision] or there is no showing that actual harm to the losing party was caused by the delay." *W. Rock Lodge No. 2120, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Geometric Tool Co., Div. of United-Greenfield Corp.*, 406 F.2d 284, 286 (2d Cir. 1968); see also *McMahon v. RMS Elecs., Inc.*, 695 F. Supp. 1557, 1559 (S.D.N.Y. 1988) (an arbitrator does not exceed his power when he issues a late decision where "there is no objection, *or* if there is no prejudice to the losing party caused by the delay").

In the instant case, Plaintiff objected to the delay "prior to the rendition of the award." (*See* Doc. # 49, ¶ 24.)  Therefore, the Court must determine whether the delay caused Plaintiff "actual harm."  *See W. Rock Lodge No. 2120*, 406 F.2d at 286.  The parties have not cited any case law, nor is the Court aware of any, defining "actual harm" in this context.  Plaintiff makes the conclusory assertion that he was actually harmed by the delay because he could not serve his suspension in 2011.  However, Plaintiff could have, but did not, act more quickly in objecting to the delay in the award.  Such delay by Plaintiff undercuts the credibility of his assertion that he would have preferred to serve his suspension in 2011, during the Broncos' postseason games.[4]  Thus, Plaintiff has failed to prove that he suffered "actual harm."  Accordingly, the Court finds that Mr. Henderson did not exceed his powers.

---

[4]  According to the Policy, Plaintiff should have received the award before December 19, 2011. However, Plaintiff waited to object to the delay until January 16, 2012, more than one month after the December 13, 2011 hearing.  (Doc. # 49, ¶ 24.)  Notably, he filed the objection two days after the Broncos were eliminated from the playoffs.

## B.   MR. HENDERSON DID NOT ENGAGE IN MISCONDUCT

An arbitration award may be vacated "where the arbitrators were guilty . . . of any other misbehavior by which the rights of any party have been prejudiced." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1176 (9th Cir. 2010) (quoting 9 U.S.C. § 10(a)(3)) (lacuna in original).  To constitute misconduct, an arbitrator's *ex parte* communications "must have prejudiced the party resisting enforcement of an arbitral award." *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1271 (10th Cir. 1999). *Ex parte* communications prejudice a party when the communications result in an alteration or augmentation of the award. *Id.* at 1271-72 (*ex parte* communications did not prejudice a party because they did not add "anything adverse to [plaintiff] that the award had not already said or necessarily implied").

Although Defendant argues that Mr. Pash's request of Mr. Henderson to delay rendering a decision on Plaintiff's appeal did not constitute an *ex parte* communication, Defendant's primary argument is that Plaintiff cannot demonstrate prejudice from such communication.  (Doc. # 49 at 23-24.)  Plaintiff asserts that the conversation between Mr. Pash and Mr. Henderson did prejudice him because the threat of a suspension hung over his head for months instead of days.  (Doc. # 61 at 22-27.)  Further, Plaintiff alleges that the delay prevented him from beginning his suspension in 2011, which prejudiced him because he now must serve his suspension during the 2012 season when he would otherwise benefit from an increased salary.  (*Id.*)

However, the Court finds that, even assuming the conversation between Mr. Pash and Mr. Henderson constituted an *ex parte* communication, Plaintiff suffered

no prejudice.  Although Plaintiff may have been negatively impacted emotionally and financially by the delay in the award, he failed to show that the communication between Mr. Henderson and Mr. Pash resulted in an alteration or augmentation of the award, itself.  Thus, the alleged *ex parte* communication in this case did not constitute misconduct.

## C.  THE AWARD DOES NOT VIOLATE PUBLIC POLICY

Plaintiff next contends the award violates public policy because it contravenes "established laws of the international sports community and the public policy underlying those laws."  (Doc. # 61 at 27.)  A district court has discretion to vacate an arbitration award if it contravenes public policy.  *W.R. Grace & Co. v. Local Union 759 Intern. Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.,* 461 U.S. 757, 766 (1983).  However, for a court to determine that an award contravenes public policy, the policy must be "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *Id.*  (quoting *Muschany v. United States,* 324 U.S. 49, 66 (1945)) (internal quotation marks omitted).

Plaintiff argues that Defendant, and "all major sports leagues, [have] held out the Court of Arbitration for Sport ('CAS') as the standard-bearer for arbitration proceedings such as those at issue here."  (Doc. # 61 at 27.)  He asserts that CAS rulings are an industry standard because arbitrators in Major League Baseball ("MLB") relied upon a CAS precedent in a recent ruling.  (*Id.* at 29.)  Specifically, MLB vacated a 50-game suspension for player Ryan Braun when a urine specimen collector failed to follow the

MLB Steroid Policy because, according to the CAS, "the rule-makers and the rule-appliers must begin by being strict with themselves." (*Id.* at 28.)  To further this notion, Plaintiff relies on the ruling in *Conoco, Inc. v. Oil, Chemical & Atomic Workers Int'l Union*, in which the court noted that "[e]stablished rules and practices of an industry create an industrial common law . . . ."  Nos. 87-1482, 86-1639, 1988 WL 163062, at *2 (10th Cir. 1988) (unpublished) (affirming the district court's decision to vacate an arbitration award because the arbitrator "disregarded the existing common law of the particular industry and imposed his own brand of industrial justice").

    *Conoco, Inc.*, however, is distinguishable from the case at hand.  In *Conoco, Inc.*, the "rules and practices" that created an "industrial common law" were defined in "the employee handbook, posted at the factory and frequently distributed to employees." *Id.*  Despite Plaintiff's insistence to the contrary, the Court declines to construe "major sports leagues" as one "industry."  MLB's one-time use of a strict liability policy regarding the collection and testing of urine specimens falls far short of the requirements needed to create an industrial common law.  Moreover, MLB and Defendant are governed by different collective bargaining agreements.  Consequently, the CAS strict liability standard is not a "well-defined and dominant" public policy applicable to Defendant.   As such, the award does not violate public policy.

**D.     MR. HENDERSON DID NOT MANIFESTLY DISREGARD THE LAW**

    Plaintiff next alleges that Mr. Henderson manifestly disregarded the law concerning the chain of custody of his urine specimen.  (Doc. # 61 at 30.)  Specifically, he claims that Mr. Henderson was "willfully inattentive" to the standards governing

a valid chain of custody, which require evidence "sufficient to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with." *United States v. Washington*, 11 F.3d 1510, 1514 (10th Cir. 1993) (internal quotation marks and citations omitted).  The Court finds Plaintiff's argument unpersuasive.

"Manifest disregard of the law clearly means more than error or misunderstanding with respect to the law." *Abbott v. Law Office of Patrick J. Mulligan,* 440 Fed. Appx. 612, 620 (10th Cir. 2011) (unpublished) (quoting *ARW Exploration Co. v. Aguirre,* 45 F.3d 1455, 1463 (10th Cir. 1995)).  To establish "manifest disregard," a party must demonstrate "the arbitrator's 'willful inattentiveness to the governing law.'" *Id.* (quoting *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 130 S. Ct. 1758, 1767 (2010)).  Specifically, "the record must show the arbitrator[] knew the law and explicitly disregarded it." *Hollern v. Wachovia Sec., Inc.,* 458 F.3d 1169, 1176 (10th Cir. 2006) (quotation marks and citation omitted).  Further, "the manifest disregard standard applies only to conclusions of law, not to the arbitrators' factual findings, which are beyond review." *Hosier v. Citigroup Global Markets, Inc.*, --- F. Supp. 2d ---, No. 11-cv-00971, 2011 WL 6413812, at *3 (D. Colo. Dec. 21, 2011).

Plaintiff cites no evidence in the record showing that Mr. Henderson explicitly disregarded the evidentiary standards governing a valid chain of custody.  Further, formal evidentiary rules are "inapplicable to arbitration proceedings." *Bowles Fin. Group, Inc. v. Stifel, Nicolaus & Co., Inc.*, No. CIV-92-1187-C, 1993 WL 663326, at *4 (W.D. Okla. Feb. 26, 1993) (unpublished), *aff'd,* 22 F.3d 1010 (10th Cir. 1994); *see also*

*Nat'l Post Office, Mailhandlers, Watchmen, Messengers & Group Leaders Div.,*

*Laborers Int'l Union of N. Am., AFL-CIO v. U.S. Postal Serv.*, 751 F.2d 834, 841 (6th

Cir. 1985) ("arbitrators are not bound by formal rules of procedure and evidence").

However, even if these evidentiary rules were applicable to the arbitration proceedings,

Mr. Henderson weighed the evidence and determined that it was improbable that

Plaintiff's urine had been contaminated or tampered with.  (Doc. # 41-11 at 7-8.)

Therefore, the Court finds that Mr. Henderson did not manifestly disregard the law.

## E.    MR. HENDERSON WAS AN IMPARTIAL ARBITRATOR

Plaintiff's final allegation is that Mr. Henderson was not an impartial arbitrator

because he engaged in *ex parte* communications with Defendant.  (Doc. # 61 at 32-33.)

"For an award to be set aside, the evidence of bias or interest of an arbitrator must be

direct, definite and capable of demonstration rather than remote, uncertain, or

speculative." *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982).

However, when a party is aware of the possibility of bias, he "cannot remain silent,

raising no objection during the course of the arbitration proceeding, and when an award

adverse to him has been handed down complain of a situation of which he had

knowledge from the first." *Cook Indus., Inc. v. C. Itoh & Co. (Am.) Inc.*, 449 F.2d 106,

107-08 (2d Cir. 1971); *see also Pub. Serv. Co. of Okla. v. Burlington N. R.R.*, No. 95-

5017, 1995 WL 640375, at *5 (10th Cir. Oct. 20, 1995) (table decision) (holding that the

plaintiff waived his right to claim arbitrator bias when he was aware of the facts that

gave rise to the bias claim prior to the arbitrator's decision); *Ohlfs v. Charles Schwab &

Co., Inc.*, 08-CV-00710, 2012 WL 202776 (D. Colo. Jan. 24, 2012) (a party waives his

right to claim arbitrator bias when he "has knowledge of facts suggesting bias or partiality on the part of an arbitrator but fails to object on this basis prior to the entry of an award").

The Court has already determined that the alleged *ex parte* communication did not amount to misconduct.  Thus, such communication is insufficient to sustain this claim that the arbitrator was not impartial.  Further, Plaintiff was aware that Mr. Henderson was appointed by the Commissioner of Defendant yet did not object on the basis of bias during the proceedings; rather, Plaintiff waited until after receiving an adverse decision to do so.  (*See* Doc. # 41-4 at 5.)  Accordingly, under the legal standards set forth above, the Court determines that there is insufficient evidence to sustain Plaintiff's claim that the arbitrator was biased.

## IV.  **CONCLUSION**

Accordingly, IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. # 49) is GRANTED.

It is FURTHER ORDERED that Plaintiff's Motion for Preliminary Injunction (Doc. # 36) and Plaintiff's Motion for Preliminary Injunction for Clarification Purposes (Doc. # 38) are DENIED AS MOOT.

It is FURTHER ORDERED that Defendant's Motion for Hearing/Conference Regarding Motion for Summary Judgment is DENIED AS MOOT.

It is FURTHER ORDERED that the Hearing regarding Plaintiff's Motions for Preliminary Injunction set for June 25, 2012 (*see* Doc. # 70), and the Telephonic Status Conference set for July 17, 2012 (*see* Doc. # 67), are VACATED.

It is FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment.  Each party shall bear its own attorneys' fees.

DATED:  June __21__, 2012

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge